case is DeKalb County Pension Fund v. Allergan, okay. Thank you. So, we'll begin there. Mr. Killoran? Yes, sir. Am I pronouncing your name right? Very close. Killoran. Killoran, okay. So, no, not close at all. So, Mr. Killoran, you have reserved two minutes for rebuttal, so that gives you eight minutes at the gate. Thank you, your honor. All right. Good morning, your honors. I'm Robert Killoran, representing the DeKalb County Pension Fund. May it please the court. We are here because we believe the district court erroneously granted summary judgment to defendant Allergan on three separate grounds, materiality, falsity, and lost causation. The court did not, excuse me, reach the issue of scienter. The court also certified a class in this case some months ago, and after we filed our appeal, defendants filed a cross appeal to challenge the grant of class certification. So, I'll begin with addressing the motion for summary judgment order. We believe that that order is filled with a number of errors. From a big picture, the court seems to have adopted generalized policy arguments about the value of Allergan implants to the world, and she ignores much more substantial evidence that Allergan was more dangerous than it was worth, as evidenced by the fact that seven months after the class period, it was banned around the world. The FDA singled out Allergan. It requested a voluntary recall of the product around the world. But, I mean, all that's fine and good, but the issue is really whether they made misstatements, right? Actual misstatements. I mean, there are other issues as well. Why don't we start there? Okay, great, your honor. So, the district court set up what we think is an erroneous bar that's virtually impossible to reach, given the nature of this case. She said that, as it turns out, neither the scientific studies nor the regulatory community determined that Allergan's textured implants are, in fact, more closely associated with BIA ALCL. For clarity, that's Breast Implant Associated Anaplastic Large Cell Lymphoma. I'm going to just save some syllables and call it ALCL for the rest of the argument, if that's okay. And so the court, she said that the studies do not support that it was, in fact, more closely associated. That's not the way these studies work. They don't draw hard conclusions. These studies came as close as they possibly could have to supporting. Maybe we should get to the statements themselves. Sure. Because it seems to me the issue is whether the statements themselves are false. Yes, your honor. Or are misleading. Your honor. That they would leave an investor of reasonable intelligence with an impression that this is a claim of sort of best in breed, right? That they're better than others or that they're no worse than others. No worse than others, your honor. They were by far the worst. In our opinion, we believe that the evidence shows that by some studies they were 14 times more likely to cause ALCL. Again, all of that may be true, but you're not suggesting they have an independent obligation to disclose that just because investors would like to know it, right? Not just because of that, your honor. It all turns on statements made, right? That is correct. So what are the statements? For example, on the May 29, 2018 press release, Allergan, after some new information came out showing this tremendously close association between Allergan and far exceeding that of its competitors, it had a rapid response team that went all the way to the top of the company involving the CEO and the top medical people and top executives and top sales people. They were trying to put out fires. Again, what is the misleading statement? The second is saying to women in this release in response to negative press about ALCL that when diagnosed and treated early by surgical specialists, BIA ALCL has a good prognosis worldwide. It has been reported in multiple different implant manufacturers. There's a footnote. There are five footnotes, nine through 13, or four footnotes. Every one of them cites to obsolete studies and intentionally misses, leaves out the recent studies showing the huge connection between Allergan and ALCL. The next- Is it enough? I mean, I understood the district court to have framed the question as specifically that Allergan is, that the alleged misrepresentation is that Allergan is not, I'm taking the story away, is more closely linked than other manufacturers. And so what is it in these statements that suggest that, to kind of say it in the reverse way, that Allergan is just as safe or safer than the others? Yeah, well, okay. I think they sort of said it directly. Also, I'm sorry, just one more thing. I assume you accept that that is what the nature of the misstatement that you are, you're limited to, not just that Allergan is associated with this condition, but that it is, in fact, more closely associated? Yes, Your Honor. That is absolutely correct. Because Allergan was recalled at the end of the class period. Its use was suspended in France and then never reinstated. And it's because we believe it was more dangerous. Other manufacturers who came up for renewal after Allergan were not suspended. Allergan was simply the head of the pack, and they didn't tell their investors that they had a huge problem. Internally, their executives knew about it and said this could be a crisis. And that was back in 2016, you know, over a year before the start of the class period. They knew they had a huge burning fire. But the statement is, I mean, that you focused on was that ALCL has been reported with multiple different implant manufacturers. Yes, Your Honor. That is a true statement, right? Yes, that is true, as far as it goes. That somehow opened the door for them to disclose the relative association levels of the different manufacturers? We're saying that in a press release directed to plastic surgeons and users of the product we would submit primarily, if they're going to make those kind of general statements about its safety and efficacy and studies supporting its safety, they have a duty to put in the bad ones that just came out. We think it's misleading to leave them out. And then another major false statement was in their SEC 10-K filing, which they repeated year after year that said there's another manufacturer in Europe that has worse problems than Allergan. But it doesn't say that, right? Well, no, you're right. There were negative reports from regulatory authorities in Europe related to a breast implant manufacturer that is not affiliated with the company. That is correct, Your Honor. But that's not what you just said. I apologize. I'm simply trying to paraphrase. That's a false statement? Paraphrase. There were negative reports from regulatory authorities in Europe related to a breast implant manufacturer that's not affiliated with the company. Your Honor, we think that is a misleading statement by omission because there was no such manufacturer, it turns out. It was referring to a company that had gone out of business seven years ago, and yet they ran that statement in their safety disclosure section seven years in a row. And even the court at our firm was misled by the meaning of it when this case was filed. The court in the motion to dismiss said that's clearly misleading. I guess it's not clear to me why it is misleading. Oh, well, because- There were negative reports from regulatory authorities related to a breast implant manufacturer not affiliated with the company. What part of that is not true? Because it was in a safety report. Those negative reports hadn't occurred for seven years, and so the reader would naturally assume they must be talking about something current because there had been no news on PIP for seven years. But the sentence starts out with, from time to time, reports related to the quality and safety of breast implant devices are published, including this, including that. It was very nonspecific as to time, since there have been bad associations. Your Honor, I agree with that, except that when a reasonable reader reads, as well as negative reports from regulatory authorities in Europe related to a breast implant manufacturer, one would assume that that is not more than seven years of stale news. There are cases that say a company has a duty to update their disclosures to keep them from being misleading. And so an investor might assume- Was there a more recent regulatory authority in Europe that made statements about the breast implants? There was no other company that fit the description in this statement, and we learned only at the end of the discovery that they were referring to a company that had been out of business for seven years. But I'm not sure why it matters whether the company was in business or out of business. Well, because it would go to whether the statement was more relevant and appropriately in an SEC filing. By the way, I see I'm out of time, Your Honor. Regulatory authorities are onto this as potentially dangerous, right? That is correct, Your Honor. And so the question is, can Allergan's rapid response team, which we contend was put together to defer, deflect, and downplay, can they keep that from causing Allergan to lose investors, to lose stock value, and to keep sales up with plastic surgeons? And so we think that they simply went on a campaign of misinformation. All right. Well, you've reserved two minutes for rebuttal. All right. Thank you, Your Honor. Thank you. We'll now hear from Mr. Gerber. Thank you. Thank you, Your Honor. Jared Gerber from Clear Godly on behalf of the defendants. The district court here issued a thorough and well-reasoned opinion, granting summary judgment on multiple independent grounds. Right. So which is the strongest in your view? You're asking me to pick my favorite child. I do think that one of the cleanest here is the one that you were just focusing on, the fact that there was no misleading statement here that would give rise to a duty to disclose anything about relative incidence rates across manufacturers. The plaintiffs here have made arguments that the district court ignored expert evidence, weighed facts. And I think from those two lenses, that really is the cleanest ground to decide. There was no expert evidence submitted by the plaintiffs on how to interpret that statement in a way to refer to relative incidence rates across manufacturers. So why wasn't it misleading generally for Allergan in 2017, and I guess it was filed, the 10K was filed in 2018, to refer to an incident that occurred in 2010 with regard to another manufacturer, which was overt. I mean, people probably remembered that it was a bad time, but wasn't it, didn't that create some kind of misleading context for the general statement that you were making? Right. So, Your Honor, our view is it wasn't over, that it continued throughout the class period until after the class period. There were very prominent reports about a medical authority in Germany that was found guilty of gross negligence in connection with that scandal. So it wasn't something that was in the distant past. The second point that I would make is that it is a well-known scandal with respect to breast implants. So it wasn't something that people had forgotten about, people weren't aware of. It was the company, Allergan, informing the investing public that breast implants are a very sensationalized and politically fraught area that gets a lot of negative coverage. And here is an example of a prominent scandal that happened over time. The last point that I would make on that is even if an investor wasn't aware of that scandal, the plaintiffs present no evidence, no expert evidence, no fact, record evidence, that an investor would instead read it as referring to BIA ALCL. There is that separate clause before that clause that provides a separate set of reports about breast implants. What does it make of the fact that it appears, I guess, that the district court at the motion to dismiss stage actually did interpret it the way that you're saying it would not be interpreted? Yeah, so, you know, the district court there, you know, this was not a theory that was clearly laid out in the complaint. The district court reached a bit for this theory and gave the plaintiffs the sort of benefit of the doubt. Accepted as true their allegation or the argument that they made at the motion to dismiss stage that it could be read this way. And made a comment that she did so without sort of the benefit of the defendant's arguments on that. I disagree with how she read it at the motion to dismiss stage. I think on reflection it seems like she disagreed with how she read it at that stage. You know, I think she probably read it quickly and didn't focus on the structure of the sentence. Looking at it with fresh eyes, I think it's clear as a matter of grammar, as a matter of syntax, and from, you know, just general knowledge of how reasonable investors in breast implant companies would be aware of that prior scandal, that it clearly sets forward two separate examples of negative reports about breast implants that have existed over time. One, the BIA LCL reports, and two, this PIP scandal about the non, the industrial grade billing that people would know. There's no reference back from the second clause to the first. It's clearly separated by as well as meaning that it's separate. It says, you know, reports in front of both examples. So it's giving two examples of negative reports. So I understand that the district court at the motion to dismiss stage really bent over backwards to credit the allegation that was made. But at the summary judgment stage, you can't just rely on the allegation. You have to provide evidence, hard evidence. This court has said, and there just was none on that topic. Can I ask a question about materiality? Yes, please. I haven't studied up on materiality a whole lot. It does look like the numbers, you know, the proportion of business that the breast implants were for Allegan was very, very small. But I'm concerned that the implications are that you could just make blatant false statements, and it wouldn't be securities fraud. That would be actionable simply because it's a small portion of your company's overall business. How can you set my mind against that? Yeah, so there are both qualitative factors and quantitative factors that go into materiality. That's the standard that the SEC sets out in its guidance and that this court has adopted. So the quantitative factor sets sort of a presumption that anything below 5% of the relevant financial metric is immaterial. But it doesn't end the analysis. You also have to look at qualitative factors. So if a company is intentionally misleading, that's a qualitative factor that you could consider. If it's a really egregious case of illegal conduct, that's one of the explicit qualitative factors. That would make even a relatively small or a very small business line like this potentially material to investors, a misstatement about that if it was something that egregious or illegal. That's how relatively quantitatively immaterial issues can be material under the securities laws. And your position would be then that this is nowhere close to what you'd need to overcome the quantitative aspects. Yeah, the plaintiffs don't point to any significant probative evidence that this particular product had special importance to investors. This sounds like a pretty squishy standard, the way you've just articulated it. I mean, the qualitative and the quantitative and just carry the 7 and add the 4. I mean, it seems like a difficult thing for courts to apply. So it is something that courts apply all the time at the motion-to-dismiss stage. This court has dismissed claims as immaterial at the motion-to-dismiss stage. No, I know that materiality is decided at the motion-to-dismiss stage. I'm saying that you're saying that there's some combination between what percentage of the business is represented by the product about which the false statement is made and the nature of the statement. And together we come up with a conclusion that it's not material, even though they're on different planes completely, it seems to me. Yeah, I think it's not the nature of the statement necessarily. It's still looking at the business at issue, the importance of the business at issue to investors. So is it something that even though it's not the largest financial contributor, is something that has some other reason to be important to investors? Is it, you know, the company's original product, the niche product, something that it's known for, even if it's less than, you know, 5% of assets? It's something that investors really care about, really put. We think a court could do that at the motion-to-dismiss stage. That is the test that this court has set up in, you know, Hutchison v. Deutsche Bank and ECA v. J.P. Morgan and that courts have dismissed. I think it's the rare case that a quantitatively immaterial topic, especially one that's this small, would satisfy that test. So I think that's how the courts are able to administer the test is by really realizing it's an exceptional case where something that small can be important to an investor. I think that loss causation is also a clean ground here. There is an expert opinion that the plaintiffs put in that states the legal conclusion that there's loss causation, but this court has on multiple occasions affirmed the dismissal of securities cases on loss causation grounds, notwithstanding there being similar expert opinions where the expert opinion on the legal question of loss causation was unsupportable on the record. Am I right in understanding that the price plummeted initially and then rebounded within a couple weeks? That's right. Yeah. It fell after the recall at the end of the year, but by the beginning of the next year had fully recovered to the price before. And even more basically than that, it's clear from the record evidence here that the recall that the plaintiffs point to that led to that stock price drop wasn't related to the single remaining claim that we have here, which is purportedly that Allergan's textured implants were riskier than all other textured implants. The recall announcement referred to concerns about textured implants versus smooth implants. The CE Mark non-renewal talked about textured versus smooth implants. That's not what this case is about. It's not that textured implants are more risky than smooth implants. It's that Allergan's textured implants were supposedly riskier than all other textured implants, which, as a matter of fact, we think is wrong. But even setting that aside, that's not what the recall was about. So there's no loss causation, even if it were true. All right. We have a cross appeal. I'm happy to rest on my papers on that unless there are any questions. Thank you very much. Thank you, Your Honor. And we'll hear from Mr. Kilaran for two minutes if we're going. Thank you, Your Honor. First, if I could address the question by Judge Barney. To say that the stock rebounded shortly after the class period is not to tell the entire story. The PSLRA has what they call a 90 day look back rule just to protect against such things, where if the fraud didn't cause long lasting harm, the investor has no recovery. So if the average at the end of 90 days of the stock price is not lower than the price before the fraud, there are no damages. The fact is it made a short comeback and then plummeted again after that during the 90 day class period. There was no permanent recovery. There was simply market fluctuations during the 90 day class period. And the overall end of the 90 day class period left substantial damages to the class. And that's what we're seeking. So there was not like the stock was rebounded because it was an aberrant report. Regarding materiality, the stock was sensitive to this because it was material and because analysts were following the stock. It was part of the crown jewel of Allergan's aesthetics business. And as far as materiality, there are subjective factors. My learned colleague referenced illegal conduct, but we believe that risk of cancer and death would also go to materiality. It certainly did when the FDA banned the product and said that it considers the seriousness of the event relative to the disease being treated as part of its analysis of whether a product can remain on the market. And as far as materiality, there was a rapid response team that went all the way up to the top of the corporation, run by its top people that worked very vigorously for years trying to respond to the negative news as it trickled out because Allergan knew it was coming because they had a lot of inside information about how bad the problem was. All right. Well, thank you both. We will reserve decision.